**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

**MARY JO MCKINLEY, Individually and as Administrator of the Estate of HOWARD MCKINLEY,**

       Plaintiff,

v.

**THE UNITED STATES OF AMERICA,**

       Defendant.

Civil Action No. 5:15-CV-101

## ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 43), Plaintiff's Partial Motion to Exclude Expert Testimony of Glenn Preminger, M.D. (Doc. 36), and Defendant's Motion to Exclude the Expert Witness Testimony of Drs. Mark Keaton and Maxwell White (Doc. 37). For the reasons given herein, Defendant's motion for summary judgment is granted in part and denied in part, Plaintiff's motion to exclude is granted, and Defendant's motion to exclude is denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This is a negligence action brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1) (2013) and 28 U.S.C. §§ 2671–80 (2000). Plaintiff commenced this action individually and as the administrator of the estate of her now-deceased husband, Howard McKinley. (Doc. 7). Plaintiff is seeking

compensation for damages resulting from the death of Mr. McKinley.  (Doc. 7).

Plaintiff alleges that Mr. McKinley died as a result of the negligence of various

personnel at the United States Department of Veterans Affairs' Tennessee Valley

Healthcare System ("Nashville VA") in Nashville, Tennessee.    (Doc. 7).

Mr. McKinley was first seen at the Nashville VA on July 29, 2010 in the

emergency room, following an episode of gross hematuria (blood in his urine).

(Doc. 7-4, pp. 465–66).  Mr. McKinley was referred to the urology department at

the Nashville VA "for possible cystoscopy as soon as possible."  (Doc. 7-4, p.

466).  Mr. McKinley underwent cystoscopy at the Tennessee VA on September

9, 2010, which revealed urothelial carcinoma (cancer).  (Doc. 7-4, pp. 150, 679–

80).

As a result of his urothelial carcinoma diagnosis, Mr. McKinley underwent

bladder biopsy and tumor removal surgery on November 23, 2010.  (Doc. 7-4,

pp. 372–73).  Pathology for the removed tumor showed non-invasive high-grade

papillary urothelial carcinoma.  (Doc. 7-4, p. 159).  The two biopsies taken during

the procedure were "negative for tumor." (Doc. 7-4, p. 159).

On December 17, 2010, Mr. McKinley returned to the Nashville VA for a

follow up appointment after his surgery, and cytology again showed urothelial

carcinoma as well as large amounts of blood in his urine.  (Doc. 7-4, p. 426).  A

resident physician at the Nashville VA ordered Mr. McKinley to follow up in two

months for a surveillance cystoscopy. (Doc. 7-4, p. 426). However, after a hospitalization for gross hematuria in late December and multiple calls to the urology clinic by Mr. McKinley and his wife with complaints of hematuria and difficulty urinating, repeat cystoscopy was scheduled for January 18, 2011. (Doc. 7-4, pp. 414, 418).

The bladder biopsies taken during Mr. McKinley's January 18, 2011 cystoscopy revealed urothelial carcinoma in-situ. (Doc. 7-4, p. 399). At that point, Mr. McKinley's physicians recommended that he undergo a course of Bacillus Calmette-Guerin chemotherapy ("BCG"). (Doc. 7-4, pp. 399–400). Mr. McKinley began a six week course of BCG on February 15, 2011, which concluded on March 29, 2011. (Doc. 7-4, pp. 20, 400).

On May 6, 2011, Mr. McKinley underwent cystoscopy again. (Doc. 7-4, p. 654). The procedure revealed at least three velvety lesions inside of Mr. McKinley's bladder that were suspicious for carcinoma in situ, but could have also been caused by his recent BCG. (Doc. 7-4, p. 655). As a result, an additional cystoscopy and a biopsy were scheduled for June 28, 2011. (Doc. 7-4, p. 655). During the June 28 cystoscopy, it was "extremely difficult to fully examine [Mr. McKinley's] bladder," due to his body habitus and high bladder neck. (Doc. 7-4, p. 650). Nonetheless, two biopsies were taken, which revealed "largely denuded urothelial mucosa with urothelial dysplasia" as well as

muscilaris propria. (Doc. 7-4, p. 340). As a result, it was recommended that Mr. McKinley return in six weeks for another course of BCG. (Doc. 7-4, p. 651). This round of BCG did not begin until November of 2011. (Doc. 7-4, p. 313). The second round of BCG concluded on November 22, 2011, and Mr. McKinley was ordered to return in six weeks. (Doc. 7-4, p. 312).

At his December 20, 2011 appointment, a CT scan was performed of Mr. McKinley's bladder, revealing a bladder mass consistent with a clinical diagnosis of carcinoma, although there was no metastatic disease at the time. (Doc. 7-4, p. 249). The scan was difficult to evaluate, as the bladder appeared decompressed. (Doc. 7-4, p. 309). On January 5, 2012, Mr. McKinley underwent another cystoscopy, during which the posterior bladder wall showed signs of either BCG changes or carcinoma in situ, and the right lateral wall exhibited what could have been either BCG changes or papillary superficial bladder cancer. (Doc. 7-4, p. 640).

On February 13, 2012, Mr. McKinley underwent cystoscopy, urethral dilation, and bladder barbotage. (Doc. 7-4, pp. 286–87). During the procedure, there were "no obvious bladder tumors seen." (Doc. 7-4, p. 287). Mr. McKinley returned to the Nashville VA on February 23, 2012. (Doc. 7-4, p. 278). He had been experiencing periodic gross hematuria since the February 13, 2012 procedure. (Doc. 7-4, p. 278). The resident physician "[h]ad an extended

conversation with [Mr. McKinley] about [gross hematuria] following this type of procedure," and instructed Mr. McKinley to follow up as scheduled on May 17, 2012.  (Doc. 7-4, p. 278).

Mr. McKinley continued to experience gross hematuria between February and May of 2012.  (Doc. 7-4, pp. 255, 278).  He was seen at the Nashville VA on May 17, 2012 and underwent cystoscopy on May 31, 2012.  (Doc. 7-4, pp. 256, 246).  The cystoscopy revealed no tumor recurrence, bullous edema, and a high riding bladder neck.  (Doc. 7-4, p. 246).  Mr. McKinley was scheduled for a follow up appointment in six months.  (Doc. 7-4, p. 249).

In July 2012, Plaintiff and Mr. McKinley relocated to Bibb County, Georgia. (Doc. 43-2, p. 4).  Mr. McKinley visited the Dublin, Georgia VA hospital to establish primary care on August 28, 2012.  (Doc. 49-3, p. 17).  During this visit, Mr. McKinley told his physician that his bloody urination persisted.  (Doc. 49-3, p. 17).  He was referred to a non-VA urologist, and an appointment was scheduled for October 2012.  (Doc. 49-3, p. 17).  On September 13, 2012, Mr. McKinley returned to the Dublin VA due to continued bloody urination and the onset of low blood pressure.  (Doc. 49-3, p. 17).  While hospitalized, Mr. McKinley underwent an abdominal and pelvic CT scan at the direction of a urologist, which revealed findings consistent with advanced bladder cancer and metastatic disease.  (Doc. 49-3, p. 18).

Mr. McKinley's diagnosis was confirmed after he underwent tumor removal surgery on October 2, 2012. (Doc. 49-3, p. 18). A large necrotic tumor was removed, and pathology results revealed malignancy. (Doc. 49-3, p. 18). Despite aggressive chemotherapy and radiation, Mr. McKinley's cancer worsened, spreading to his brain and eventually killing him on September 21, 2013. (Doc. 49-3, pp. 18–19). Mr. McKinley died at his home in Georgia. (Doc 43-2, p. 4).

Plaintiff initially presented her claims to the VA for wrongful death, medical expense, pre-death pain and suffering, loss of consortium, and ordinary negligence on October 4, 2013. (Doc. 43-2, p. 4). The VA denied her claims initially and on appeal. (Doc. 43-2, p. 5). Plaintiff filed this lawsuit on March 20, 2015, just over one month after her request for reconsideration was denied. (Doc. 1).

## II.    THE PARTIES' <u>DAUBERT</u> MOTIONS

The Court will address the Parties' respective motions to exclude before turning to Defendant's Motion for Summary Judgment because whether the Parties' proposed experts will be allowed to testify relates to the summary judgment analysis.

**A.    Plaintiff's Partial Motion to Exclude the Expert Testimony of Glenn Preminger, M.D. (Doc. 36)**

Plaintiff filed a motion to exclude testimony by Dr. Preminger regarding the films from any of Mr. McKinley's CT scans.  (Doc. 36).  Plaintiff claims that following the December 20, 2011 CT scan, the providers at the Nashville VA failed to act upon a new bladder tumor that was identified by the radiologist, and as a result, Mr. McKinley's bladder cancer went undiagnosed until September 19, 2012.   During his deposition, Dr. Preminger testified that he had not been provided with any of the CT scan films, and that he would "defer to radiologists or – or to someone with more expertise in managing the cancer to opine about those specific films."  (Doc 36-1, p. 18).  As a result of this testimony, Plaintiff argues that Dr. Preminger should be precluded "from testifying at trial regarding the CT scan films or their contents because by his own admission, he is not qualified to give such opinions and no such opinions have been disclosed to Plaintiff."  (Doc. 36, p. 5).

At the June 26, 2017 hearing, Defendant conceded that it does not intend to offer any expert testimony about the interpretation of any of Mr. McKinley's CT scan films.  (See also Doc. 45, p. 2).  Dr. Preminger's testimony regarding the CT scans will apparently be limited to the content of the films, as discussed in the radiologist's reports.   As a result, the Parties agree that this motion has been

resolved.  Plaintiff's Partial Motion to Exclude the Expert Testimony of Glenn Preminger, M.D. (Doc. 36) is **GRANTED**.

### B.  Defendant's Motion to Exclude the Expert Witness Testimony of Drs. Mark Keaton and Maxwell White[1]

Defendant moves to exclude the testimony of Dr. Mark Keaton and Dr. Maxwell White, arguing that neither physician is competent to testify under Tennessee law.  Further, Defendant argues that Dr. Keaton's testimony is not relevant under Tennessee law or credibly reliable under federal law.

### 1.  Standard of Review

"When analyzing a FTCA claim, [federal courts] appl[y] the law of the state in which the alleged tort was committed."  Duque v. United States, 216 Fed. Appx. 830, 832 (11th Cir. 2007) (per curiam) (citation omitted).  "In state medical malpractice actions brought in Georgia federal courts, 'state law governs substantive issues and federal law governs procedural issues.'"  Adams v. Lab Corp. of Am., No 1:10–cv–3309–WSD, 2012 WL 370262, at *8 (N.D. Ga. Feb. 3, 2012) (citation omitted) (quoting McDowell v. Brown, 392 F.3d 1283, 1294 (11th Cir. 2004)).  "Whether a medical expert is competent to testify is a substantive issue[,] governed [in this case] by [Tennessee law] . . . ."  Id. (citations omitted);

---

[1] In its Motion to Exclude, Defendant argues that any expert testimony related to matters not presented in Plaintiff's Form 95 is inadmissible.  This argument was also raised in Defendant's Motion to Dismiss.  The Court has addressed this argument in its discussion of Defendant's Motion to Dismiss *infra*, pages 44–48.

see also Dukes v. Georgia, 428 F. Supp. 2d 1298, 1313 (N.D. Ga. 2006) ("The Eleventh Circuit stressed in McDowell that when determining the competency of an expert witness in state medical malpractice claims, federal courts first should apply the competency standard under state law.").

"Once a district court determines that a medical expert is qualified to offer an opinion under [Tennessee law,] the proposed expert testimony is [ ] screened under Federal Rule of Evidence 702 and Daubert[2] to determine if it is otherwise admissible." Adams, 2012 WL 370262, at *8 (citation omitted). In sum, when determining admissibility of an expert witness's testimony, "[t]he analysis . . . , is first whether the expert is qualified to render an opinion regarding the standard of care (the competency component) [under state substantive law, via Fed. R. Evid. 601], and second, whether the expert's causation theory meets the strictures of Rule 702." McDowell, 392 F.3d at 1295.

> 2.   Drs. Mark Keaton and Maxwell White Are Competent to Testify Under Tennessee Law

To prevail on a claim for medical malpractice in Tennessee, a plaintiff must prove by competent[3] opinion evidence:

---

[2] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

[3] Section 29-26-115(b) of the Tennessee Code imposes a competency requirement on the plaintiff's expert witnesses as well as the defendant's rebuttal witnesses. Tenn. Code Ann. § 29-26-115(b).

The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred[.]

Tenn. Code Ann. § 29-26-115(a)(1).

An essential element of a claimant's proof is the "recognized standard of acceptable professional practice . . . in the community in which the defendant practices or in a similar community." Tenn. Code. Ann. § 29-26-115(a)(1). This requirement is known as the "locality rule." Shipley v. Williams, 350 S.W.3d 527, 537 (Tenn. 2011). "The statute does not require a particular means or manner of proving what constitutes a 'similar community,' nor does it define that term." Id. at 552. The Tennessee Supreme Court has observed that, "[g]enerally, an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; or has visited the community or hospital where the defendant practices, will be sufficient" to establish the expert's competency in a medical malpractice action. Id. An expert is not required to

have "personal, firsthand, direct knowledge" of the applicable standard of care to meet the competency requirement. Id. at 552–53.

Further, "an expert may utilize a national or regional standard of care in formulating an opinion in a medical malpractice case, but only if that expert first establishes familiarity with the relevant local community and then explains that the local and national standard are the same." Miller v. Chinenye Uchendu, M.D., No. 13–CV–2149–SHL–DKV, 2016 WL 4524306, at *2 (W.D. Tenn. July 21, 2016 (citing Shipley, 350 S.W.3d at 553)). "[I]n many instances[,] the national standard is representative of the local standard." Shipley, 350 S.W.3d at 553 (citations omitted).

In its Motion to Exclude, Defendant argues that Drs. Keaton and White base their testimony on the national standard of care, and that neither has established familiarity with the Nashville community or that they practice in a similar community. As a result, Defendant argues that Plaintiff's experts fail to meet the requirements of Tennessee's locality rule and are not qualified to testify under Tennessee law.

In response, Plaintiff submitted supplemental affidavits[4] from each of her experts, which purportedly establish that both experts have familiarized

---

[4] In its Reply Brief (Doc. 60), Defendant argues that the Court should not consider the supplemental affidavits because they were untimely filed without the permission of the Court. Defendant notes that Plaintiff has not demonstrated that

themselves with the Nashville community since their depositions, and have determined that Nashville is a similar medical community to both Atlanta and Augusta, respectively. Accordingly, Plaintiff contends that both experts are qualified to testify as to the recognized standard of care in the Nashville medical community and at the Nashville VA. The Court agrees with Plaintiff.

### i.  Dr. Mark Keaton

Dr. Keaton is the Principal Investigator for Augusta Oncology Associates ("Augusta Oncology") in Augusta, Georgia, where he has been employed since 2002. (Doc. 49-2, p. 4). In addition, Dr. Keaton serves as an Associate Professor of Medicine at Augusta University, a position that he has held since 2015. (Doc. 49-2, p. 4). During his time at Augusta Oncology, he has worked on approximately five to six clinical trials at the Sarah Cannon Research Institute in

the delay in filing was either substantially justified or harmless, and as a result, Defendant contends that the affidavits should be excluded under Rule 37 of the Federal Rules of Civil Procedure.

Although the Court agrees that Plaintiff failed to produce the expert affidavits by the May 10, 2016 deadline to supplement expert reports, the Court sees no need to impose sanctions or to exclude the information in the affidavits. At the hearing on this motion, the Court offered Defendant the opportunity to further depose Plaintiff's experts via telephone at Plaintiff's expense. Defendant's attorney did not appear interested in this option. In the Court's view, the additional information contained in the affidavits does not change the experts' opinions as they were provided in the experts' reports or during their depositions. Rather, the affidavits serve to qualify the experts to testify as to these opinions under Tennessee's locality rule. As a result, the Court has considered the information contained in the affidavits in reaching its decisions on the pending motions.

Nashville, Tennessee. (Doc. 49-2, p. 5). This facility is located across the street from Vanderbilt University. (Doc. 49-2, p. 5). In addition, in his position as Associate Professor at Augusta University, he is currently working to reestablish a partnership with the Sarah Cannon Research Institute for new clinical trials. (Doc. 49-2, p. 5). Further, Dr. Keaton has referred approximately ten patients to the Sarah Cannon Research Institute for treatment. (Doc. 49-2, p. 5). As a result of his work with the Sarah Cannon Research Institute and through his medical training, Dr. Keaton has formed relationships with several physicians who practice in Nashville. (Doc. 49-2, p. 5). He has had numerous conversations with these physicians about their patients, clinical trials, and other medical issues. (Doc. 49-2, p. 5).

In addition to Dr. Keaton's firsthand knowledge of the Nashville medical community, he has since familiarized himself with relevant statistical data. As the Tennessee Supreme Court concluded in Shipley, a proffered medical expert need not "demonstrate 'firsthand' and 'direct' knowledge of a medical community . . . in order to qualify as competent to testify in a medical malpractice case." Shipley, 350 S.W.3d at 552. It is sufficient for the expert to educate himself about the characteristics of the medical community by "reading reference materials on pertinent statistical information such as community and/or hospital size and the number and type of medical facilities in the area, conversing with the

13

other medical providers in the pertinent community or a neighboring or similar one, visiting the community or hospital where the defendant practices, or other means." Id. at 553. As described in paragraphs ten and eleven of Dr. Keaton's supplemental affidavit, he has "reviewed extensive information" about the medical community in Nashville, Tennessee, and has cited several statistics about the size of the community, the size of the Nashville VA, the number and type of medical facilities in the Nashville area, and the medical services or specialized practices available in the area. (Doc. 49-2, pp. 7–13).[5]

Based on his firsthand knowledge and review of reference materials on pertinent statistical information about the Nashville medical community, Dr. Keaton has concluded that Nashville is a similar medical community to Augusta, where he practices, and thus, that the standard of care applicable in Augusta is also applicable to the physicians at the Nashville VA, who allegedly breached the

---

[5] Both Drs. White and Keaton cite statistical data about the medical communities of Nashville, Atlanta, and Augusta based on present-day information, as opposed to data from the relevant time period of 2010 to 2012. Defendant takes issue with this in its Reply Brief (Doc. 60, p. 9) and argues that the statistics presented cannot be used to establish that Nashville is a similar community to Atlanta and Augusta under Tenn. Code Ann. § 29-26-115(a).

Pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice of the fact that the statistics associated with the medical communities of Nashville, Atlanta, and Augusta have not changed so substantially since 2012 as to negate the findings by Drs. White and Keaton that Nashville is a similar medical community to Atlanta and Augusta, respectively.

standard of care in this case. Specifically, Dr. Keaton explains that, while Augusta is a smaller metropolitan area than Nashville, both cities have "significant" catchment areas[6], several hospitals[7], one VA hospital, and a large population of veterans[8]. (Doc. 49-2, pp. 8–9). Both Augusta and Nashville have highly regarded medical schools, students from which are trained at the local VA hospitals. (Doc. 49-2, pp. 8–9). With respect to the medical specialties and equipment available, Dr. Keaton stated that the "equipment, techniques, reference materials, practices, and procedures" that he uses in his practice in Augusta are "the same if not very similar to those utilized in and by the Nashville medical community." (Doc. 49-2, p. 9). Finally, the Nashville VA and the Augusta VA both have 17 specialties and subspecialties represented. (Doc. 49-2, p. 10).[9] Although the medical communities in Nashville and Augusta are distinct in many ways, as detailed in Defendant's Reply Brief (Doc. 60, pp. 7–8), "[a]n exact match between the two communities and medical institutions is not required." Nevels v. Contarino, No. M2012–00179–COA–R3–CV, 2013 WL

---

[6] 264,000 people with 55 hospitals in Nashville, and 67,026 people with 13 hospitals in Augusta.

[7] Augusta has 8 hospitals, Nashville has 12 hospitals.

[8] The Nashville VA has approximately 21,500 inpatient admissions per year; the Augusta VA has approximately 6,700 inpatient admissions per year.

[9] Numerous additional similarities between the medical communities in Augusta and Nashville are detailed in Dr. Keaton's affidavit.

5844751, at *7 (Tenn. Ct. App. Nov. 16, 2012). The Court is satisfied with Dr. Keaton's conclusion that Nashville is a similar medical community to Augusta. Accordingly, the Court finds that Dr. Keaton is qualified to testify as to the standard of care in Nashville and at the Nashville VA, pursuant to Tenn. Code Ann. § 29-26-115(a)(1).

### ii.    Dr. John Maxwell White

Dr. John Maxwell White is a urologist practicing with Piedmont Physicians Urology Specialists in Atlanta, Georgia. (Doc. 49-1, p. 4). Dr. White's practice involves caring for patients with bladder cancer, among other ailments. (Doc. 49-1, p. 4). He also "regularly perform[s] the following surgical procedures: cystoscopies, in the office and operating room, bladder resection, prostate resection and radical prostatectomy." (Doc. 49-1, p. 5).

In preparing to offer expert testimony in this case, Dr. White reviewed reference materials[10] to familiarize himself with the medical community in Nashville. Through his research, Dr. White has concluded that Nashville and Atlanta are similar medical communities. Specifically, he explains that both

---

[10] Dr. White has reviewed documents and depositions from this case, as well as information from the American Board of Urology, the American Board of Medical Specialties, the American Urologic Association, the U.S. Census Bureau, the U.S. Department of Veterans Affairs, the American Hospital Directory, Emory University, Vanderbilt University website, Vanderbilt University Hospital website, Atlanta VA Medical Center, Nashville VA Medical Center, www.certificationmatters.org, and articles from the Atlanta Journal Constitution.

Atlanta and Nashville are the largest cities in their states, each with multiple hospitals[11], and large catchment areas[12]. (Doc. 49-1, pp. 6–7). Further, both cities have large VA hospitals[13] where resident physicians from local medical schools are trained. (Doc. 49-1, p. 6). The VA hospitals in both Atlanta and Nashville have 11 board certified urologists on staff, as does Piedmont Hospital where Dr. White practices. (Doc. 49-1, p. 7). Finally, Dr. White notes that "[n]early every specialty and subspecialty of medicine, including urology and its subspecialties, are represented in the Nashville medical community as well as the Atlanta medical community." (Doc. 49-1, p. 8).[14] The Court is satisfied with Dr. White's conclusion that Nashville is a similar medical community to Atlanta. Accordingly, the Court finds that Dr. White is qualified to testify as to the standard of care in Nashville and at the Nashville VA, pursuant to Tenn. Code Ann. § 29-26-115(a)(1).

---

[11] Atlanta has 17 hospitals, Nashville has 12 hospitals.

[12] Metro-Atlanta has a catchment area of 479,000 with 61 hospitals in the catchment area. Nashville has a catchment area of 264,000 with 55 hospitals in the catchment area.

[13] The Nashville VA has 238 beds, and the Atlanta VA has 445 beds. Piedmont Hospital, where Dr. White practices, has 643 beds.

[14] As was true with Dr. Keaton, Dr. White's supplemental affidavit details numerous additional similarities between the medical communities in Atlanta and Nashville that the Court considered in reaching its decision on this issue.

3.     Dr. Keaton's Testimony is Relevant Under Tennessee Law

Defendant further challenges the relevancy of Dr. Keaton's testimony under Section 29-26-115(b) of the Tennessee Code, which states that:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the state that the alleged injury or wrongful act occurred.

Tenn. Code Ann. § 29-26-115(b).

### i.     *As to the standard of care*

Defendant contends that Dr. Keaton is not competent to offer standard of care testimony because he does not practice "a profession or specialty which would make [his] expert testimony relevant to the issues in the case," as required by Section 29-26-115(b) of the Tennessee Code.   Defendant points to the following facts in support of its argument: Dr. Keaton primarily treats breast cancer patients; he does not currently treat any bladder cancer patients; in previous years, he saw a couple of patients with bladder cancer each year; all of the patients he has treated with bladder cancer were in an advanced stage of cancer; his only experience treating bladder cancer in its initial stages was during his fellowship in the late 1980s; he has never performed a cystoscopy; he has

never performed a perineal cystoscopy or had a patient undergo one; he has never ordered a percutaneous biopsy on a bladder cancer patient; he has never taken a bladder biopsy; he has never performed a bladder barbitage; he has never performed a cystectomy or any surgery; and he is not versed in the risks of complications following a cystectomy. (Doc. 37-1, pp. 9–10). As a result, Defendant argues that Dr. Keaton "has a complete lack of experience with the procedures and treatment at issue in this case and is clearly not competent to testify regarding whether Mr. McKinley's physicians complied with the standard of care." (Doc. 37-1, p. 10).

The Court disagrees. Dr. Keaton has offered limited testimony as to the standard of care that should have been followed in this case. Specifically, Dr. Keaton plans to testify that the standard of care was breached when doctors at the Nashville VA delayed Mr. McKinley's initial urology work up; delayed removing the tumor and taking a biopsy; took only two random biopsies during the tumor removal operation; delayed further action after BCG chemotherapy and subsequent abnormal cytology; failed to take appropriate action to rule out bladder cancer after the December 20, 2011 CT scan result; and poorly coordinated Mr. McKinley's care at the Nashville VA.

Although Dr. Keaton is an oncologist, whereas the Nashville VA physicians who allegedly breached the standard of care were urologists, there is "no

requirement that the witness practice the same specialty as the defendant." Cardwell v. Bechtol, 724 S.W.2d 739, 751 (Tenn. 1987). Rather, the expert need only be "sufficiently familiar with the standard of care of the profession or specialty and be able to give relevant testimony on the issue in question." Id. Dr. Keaton stated that, "as an oncologist[, he] ha[s] sufficient familiarity with the treatment of cancer patients, like Howard McKinley, [ ] so as to testify to certain standards of medical practice for any medical doctor, including urologists, who are treating cancer patients in regards to appropriate wait times for medical appointments, surgical procedures, tumor removal, biopsy, response to lab and testing results, and specifically in regards to Howard McKinley, the appropriate response to the December 21, 2011 *[sic]* abdominal CT Scan." (Doc. 49-2, p. 7).

In addition to Dr. Keaton's experience treating cancer patients, he is familiar with the National Comprehensive Cancer Network (NCCN) guidelines for the treatment of bladder cancer. (Doc. 49-2, p. 13; Doc. 40, p. 35). These guidelines are national guidelines and standards applicable to the treatment of patients with bladder cancer, and they were used and taught to the urology residents at the Nashville VA during the time that Mr. McKinley was treated there. (Doc. 49-2, p. 13). According to Dr. Keaton, the NCCN guidelines, "create a framework for establishing the applicable standard of care for bladder cancer patients like Howard McKinley and are further evidence of the national standard

of care applicable to this matter, as well as the standard of care at the Nashville VA." (Doc. 49-2, p. 13). Based on his extensive experience treating cancer patients and his familiarity with the NCCN guidelines that create a framework for the standard of care applicable in this case, Dr. Keaton is competent to testify under Tenn. Code Ann. § 29-26-115(b) as to the standard of care.

### ii. As to causation

Defendant also moves to exclude Dr. Keaton's testimony as to causation under Tenn. Code Ann. § 29-26-115(b). Dr. Keaton's causation opinions primarily focus on Mr. McKinley's prognosis and chance of survival had he been timely diagnosed at the Nashville VA. (Doc. 49, p. 12). However, Defendant argues that because Dr. Keaton is an oncologist who primarily treats breast cancer patients, who has not performed or recommended many of the procedures and tests that he claims were required to meet the standard of care in this case, and who does not treat patients with early stage bladder cancer, he is not competent to provide causation testimony in this case. The Court disagrees.

Dr. Keaton is competent to provide causation testimony under Tenn. Code Ann. § 29-26-115(b). He has been practicing oncology for nearly 30 years during which time he has treated bladder cancer patients consistently. (Doc 49-2, pp. 2–4, 6). Until approximately last year, he treated two to three bladder cancer

patients per year, which is a significant amount for a cancer that is "quite treatable if it is diagnosed and treated in a timely manner." (Doc. 49-2, p. 6). According to Dr. Keaton, "the majority of bladder cancer patients never receive care from an oncologist." (Doc. 49-2, p. 6). Despite the limited opportunities Dr. Keaton has had to treat bladder cancer patients over the years, he has "managed systemic and all form[s] of chemotherapy and radiation [and] immunotherapy," and he has "recommended and referred patients for tumor removal, including radical cystectomy." (Doc. 49-2, pp. 6–7). Dr. Keaton's experience as an oncologist more than satisfies the competency prong of Tenn. Code Ann. § 29-26-115(b). Accordingly, the Court finds that Dr. Keaton is competent to provide causation testimony in this case.

### 4. Dr. Keaton is Qualified to Testify Under FRE 702, Daubert, and its Progeny

Finally, Defendant challenges the admissibility of Dr. Keaton's testimony on the grounds that it is based on his subjective beliefs and unsupported assumptions, and therefore does not advance any material aspect of the case, in violation of Federal Rule of Evidence 702 and Daubert. (Doc. 37-1, p. 12). "Federal Rule of Evidence 702, as explained by the Supreme Court in [Daubert] and its progeny, controls determinations regarding the admissibility of expert testimony." City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998). Specifically, Rule 702 states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, pursuant to Rule 702, the trial judge must undertake a "rigorous three-part inquiry" and decide whether: (1) a proposed expert is qualified to competently testify concerning his opinions; (2) his methodology is sufficiently reliable; and (3) his testimony would assist the jury, through the application of scientific, specialized, or technical expertise, to determine a fact in issue or understand the evidence. United States v. Fazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of Tuscaloosa, 158 F.3d at 562). The Supreme Court has provided a non-exclusive list of factors that may be considered in weighing the reliability of an expert's theory or methodology, including "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field."[15] United States v. Brown, 415 F.3d 1257, 1267–68 (11th

---

[15] The Advisory Committee's Notes on Rule 702 provide additional factors, including (1) whether the expert is testifying based on research that was

Cir. 2005) (citing <u>Daubert</u>, 509 U.S. at 593–94). The reliability test is flexible, and not all of the factors are applicable in every case. <u>Id.</u> "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or defendant in a civil suit, or the government or the accused in a criminal case." <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

As the Supreme Court clarified in <u>Daubert</u>, a trial court must act as a "gatekeeper" and test the reliability and relevancy of the proposed expert's opinions before determining whether they can be admitted as expert testimony. 509 U.S. at 589–93. However, "[i]n the case of a bench trial . . . , the Eleventh Circuit has commented that '[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'"[16] <u>Evanston Ins. Co. v. Premium Assignment Corp.</u>, No. 8:11-cv-2630-T-33TGW, 2013 WL 81997, at *4 (M.D. Fla. Jan. 7, 2013) (second alteration in original) (quoting <u>United States v. Brown</u>, 415 F.3d 1257, 1269 (11th Cir. 2005)). "The court has also

conducted independently of litigation, (2) whether he is "unjustifiably extrapolat[ing] from an accepted premise to an unfounded conclusion," (3) whether he has accounted for "obvious alternative explanations," (4) whether he is being as careful in reaching his opinions as a hired expert as he would for his professional work outside of litigation, and (5) whether his purported area of expertise "is known to reach reliable results for the type of opinion the expert would give." Fed. R. Evid. 702 (Adv. Comm. Notes to 2000 Amendments).

[16] As this action is brought under the FTCA, there is no right to trial by jury. 28 U.S.C. § 2402.

commented that judges serving as factfinders in the context of a bench trial are less likely than jurors to be awestruck by the expert's mystique." Id. (citations and internal marks omitted). The parties, however, "must still demonstrate that the expert testimony meets the necessary requirements." U.S. ex rel. Duncan Pipeline, Inc. v. Walbridge Aldinger Co., No. CV411-092, 2013 WL 1338392, at *4 (S.D. Ga. Mar. 29, 2013).

Defendant explains that Dr. Keaton bases his testimony on the AUA guidelines, a 2015 article from a New York institution, and a 2015 European Urologic Association guideline. (Doc. 37-1, pp. 11–12). Defendant contends that Dr. Keaton "has no specialized knowledge, skill, experience, training, or education that would assist this Court in understanding the evidence or determining a fact in issue." (Doc. 37-1, p. 12).

The Court disagrees. Dr. Keaton's education, experience treating cancer, including bladder cancer, and research and work in clinical trials more than qualifies him to testify as an expert in this case. Dr. Keaton's opinions are not based solely on the cited literature. Rather, he bases his opinions on his practice, and his opinions are bolstered by these sources. (Doc. 40, pp. 49–50, 82–85). The extent to which Dr. Keaton relies upon these sources is appropriate subject matter for cross-examination, and is not a reason to exclude Dr. Keaton's testimony. As previously stated, in the case of a bench trial, there is less of a

need for the Court to act as a gatekeeper to keep evidence out.  The Court will weigh the evidence offered at trial as it sees fit.  Accordingly, the Court finds that Dr. Keaton is qualified to testify under FRE 702, <u>Daubert</u>, and its progeny.

### III.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Taking into consideration the preceding analysis on the Parties' motions to exclude, the Court now turns to Defendant's Motion for Summary Judgment. Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party.  <u>Id.</u> at 254–55.  The court may not, however, make credibility determinations or weigh the evidence.  <u>Id.</u> at 255; <u>see also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).

Defendant argues that it is entitled to summary judgment as to all of Plaintiff's claims because: (1) Plaintiff's experts' testimony should not be

admitted; and (2) Plaintiff cannot establish the essential elements of a medical malpractice claim. Further, Defendant argues that all negligence claims predating December 20, 2011 should be dismissed because Plaintiff failed to present such claims within two years of the alleged negligence and failed to exhaust her administrative remedies with regard to these claims.

### A. Admissibility of Plaintiff's Experts' Testimony

Defendant raises a new Daubert argument in its summary judgment motion, claiming that Plaintiff's experts' testimony should be excluded because the experts have not demonstrated that their opinions are testable, have not offered an error rate for their opinions, do not base their opinions on peer-reviewed sources, and have not shown general acceptance of their opinions.

Both Drs. White and Keaton cited to a variety of peer-reviewed literature and data in support of their opinions, including but not limited to the AUA guidelines, the NCCN guidelines, a peer-reviewed journal article out of New York[17], the Cancer Staging Manual, comprehensive statistics produced by the American Cancer Society, and UptoDate.com[18]. These sources, combined with the experts' experience, provide a sufficient basis for their opinions. The experts'

---

[17] Adam Walker, Greg Gin, Paul Feustel, Barry Kogan, Take a Number? Surgical Waiting Times for Transurethral Bladder and Prostate Surgery in Albany, New York, 2 Urology Practice 234 (Sept. 2015).

[18] A peer-reviewed online source used by practitioners.

testimony is reliable, and therefore admissible. Summary judgment is not warranted on this ground.

## B. Whether Plaintiff Can Establish the Essential Elements of a Medical Malpractice Claim

Defendant moves for summary judgment as to Plaintiff's medical malpractice claims on the grounds that: (1) Plaintiff fails to prove the applicable standard of care; (2) Plaintiff fails to prove a breach of the applicable standard of care; and (3) Plaintiff fails to prove that any alleged breach caused Mr. McKinley to suffer injuries which would not otherwise have occurred. (Doc. 43-1, p. 3).

### 1. Establishing the Applicable Standard of Care

#### i. *Generally*

Defendant argues that it is entitled to summary judgment because Plaintiff has failed to prove the applicable standard of care in a medical malpractice action in Tennessee. As discussed *supra*, page 7, the first element of a medical malpractice claim requires a plaintiff to prove the "recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices *in the community in which the defendant practices or in a similar community* at the time the alleged injury or wrongful action occurred." Tenn. Code. Ann. § 29–26–115(a) (emphasis added). Defendant reiterates an argument from its Motion to Exclude the testimony of Plaintiff's experts: that neither Dr. Keaton nor Dr. White are sufficiently familiar

with the medical community in Nashville or at the Nashville VA such that they are qualified to testify as to the standard of care in this case under Tenn. Code. Ann. § 29–26–115(a).  For reasons discussed *supra*, pages 9–17, Defendant is not entitled to summary judgment on this ground.

### ii.    As to patient wait times

Defendant next argues that it is entitled to summary judgment on Plaintiff's claims involving patient wait times at the Nashville VA because Plaintiff's experts are unable to establish the relevant standard of care.  The Court disagrees.

When Dr. White was asked the basis for his opinions that the standard of care was breached by certain delays during Mr. McKinley's treatment, he explained that the opinions are based on his "standard of practice," his experience, his background, and a journal article out of New York[19].  (Doc. 39, pp. 48, 61–62).  Similarly, Dr. Keaton explained that his opinions regarding various breaches of the standard of care for patient wait times are based on his practice, including "[his] clinical care of taking care of cancer patients and trying to get things worked up in a relatively expeditious manner" and "[his] approach to patients with various different types of cancer in general," as well as the literature, such as the journal article out of New York.  (Doc. 40, pp. 49–51).

---

[19] Dr. White explains that, although the literature he is referring to is from a journal article published in 2015, the standard of care discussed in the article is no different from the standard of care at the Nashville VA in 2010.  (Doc. 39, p. 63).

The Court finds that the testimony given is sufficient to create a question of fact as to the standard of care for patient wait times. Although both experts concede that their testimony is not based on a specific guideline,[20] this is not fatal to their testimony on the issue. "'Although it would be ideal to have a citation to some medical publication to support th[e] proposition, [an expert] may testify about the standards or common knowledge of the [medical] community.'" United States v. Frazier, 387 F.3d 1244, 1299 (11th Cir. 2004) (quoting Erickson v. Baxter Healthcare, Inc., 131 F. Supp. 2d 995, 1001 (N.D. Ill. 2001)). Here, both experts testified that the wait times Mr. McKinley experienced were in breach of the standard of care, based on their respective practices and their knowledge of the literature. Defendant is not entitled to summary judgment on this argument.

> iii. *As to the number of biopsies that should have been taken during Mr. McKinley's November 2010 tumor removal surgery*

Defendant next argues that it is entitled to summary judgment on Plaintiff's negligence claim as to the number of biopsies that should have been taken during Mr. McKinley's November 2010 tumor removal surgery, because Plaintiff's experts "testified during their depositions that no standard of care existed regarding how many biopsies must be sampled . . . ." (Doc. 43-1, p. 10). The Court disagrees.

---

[20] See Doc. 39, p. 48; Doc. 40, p. 50.

Dr. White testified that it is his opinion that more biopsies should have been taken during the tumor removal surgery and that he would have taken "about six." (Doc. 39, p. 58). He bases this opinion on his experience in practice. (Doc. 39, pp. 57–58). The Court finds that Dr. White's testimony as to the standard of care for the number of biopsies that should have been taken, based on his practice, is sufficient to create a question of fact as to the standard of care for the number of biopsies that should have been taken during Mr. McKinley's November 2010 tumor removal surgery.

### 2. Proving a Breach of the Standard of Care

Defendant next argues that it is entitled to summary judgment because Plaintiff cannot establish a breach of the standard of care by the Nashville VA. Specifically, Defendant contends that any alleged breach of the standard of care offered by Plaintiff's experts is merely another treatment option proposed in hindsight.

> #### i. Allegation that physicians at the Nashville VA breached the standard of care when they did not discuss radical cystectomy as a treatment option with Mr. McKinley after his diagnosis with carcinoma in situ

Defendant first addresses Plaintiff's experts' position that the doctors at the Nashville VA breached the standard of care by not recommending that Mr. McKinley undergo a radical cystectomy after he was diagnosed with carcinoma in situ. (Doc. 43-1, p. 11).

According to Dr. White, "[o]nce the diagnosis of urothelial carcinoma in situ was made on January 26, 2011, the standard of care required that Mr. McKinley be offered a radical cystectomy (or bladder removal) as a potentially curative treatment option." (Doc. 39-2, p. 4). When asked if he agreed with Dr. White's position, Dr. Keaton responded, "I think that that option should have been discussed with him." (Doc. 40, p. 59).

Defendant argues that this testimony is contradicted by the experts' admissions that: (1) Mr. McKinley may not have been a good candidate for radical cystectomy (Doc. 39, p. 77; Doc. 40, p. 59); and (2) BCG chemotherapy, the treatment method that was used on Mr. McKinley, was not outside the standard of care and was more commonly used under the circumstances presented (Doc. 39, pp. 87–88; Doc. 40, p. 111).

Despite the experts' concessions, the Court finds that a genuine dispute of material fact remains as to whether Mr. McKinley should have been offered radical cystectomy following his diagnosis with carcinoma in situ. Dr. White testified repeatedly in his deposition that the standard of care required the physicians at the Nashville VA to offer radical cystectomy as a treatment option to Mr. McKinley, even if he was not a great candidate for the procedure. (Doc. 39-2, p. 4; Doc. 39, pp. 73, 74, 79, 82, 83–84; 85–86). Further, although Dr. White testified that BCG chemotherapy is used more often than cystectomy, he

also noted that BCG chemotherapy is not a treatment for the tumor, but rather a preventative therapy to prevent recurrence or to treat carcinoma in situ. (Doc. 39, p. 88). If Mr. McKinley was a candidate for radical cystectomy, Dr. White insists that it would have been the "most curative." (Doc. 39, p. 87). Similarly, Dr. Keaton insists that, while radical cystectomy "is a pretty significant operation with some risk of complication," the option should have been discussed with Mr. McKinley. (Doc. 40, pp. 59, 111).

The Court finds that the experts' testimony creates a genuine dispute of fact as to whether the standard of care was breached when the physicians at the Nashville VA failed to offer radical cystectomy as a treatment option for Mr. McKinley following his diagnosis with carcinoma in situ.

>    *ii.    Allegation that the physicians at the Nashville VA breached the standard of care when they did not offer radical cystectomy after Mr. McKinley's December 2011 CT scan*

Defendant next challenges Plaintiff's experts' opinion that radical cystectomy should have been offered to Mr. McKinley following his December 2011 CT scan. In his report, Dr. White opined that, following Mr. McKinley's December 2011 CT scan and the discovery of a mass that was consistent with clinical diagnosis of carcinoma, "[t]he standard of care . . . required that Mr. McKinley again be recommended for cystectomy (or bladder removal)." (Doc. 39-2, p. 7). Dr. Keaton stated that "had Mr. McKinley undergone cystectomy

after the results of the December 20, 2011 CT scan which showed new bladder mass on the outside wall of his bladder consistent with clinical diagnosis of carcinoma, then more likely than not, he would be alive today."  (Doc. 40-3, p. 10).

Defendant asserts that there is no genuine dispute of fact because Dr. White later conceded that the standard of care did not necessarily require a cystectomy at this time, based on the information available (Doc. 39, p. 121), and Dr. Keaton's testimony "is based on hypothetical possibilities that may not even exist," because it is not clear that Mr. McKinley was a candidate for radical cystectomy.  (Doc. 43-1, p. 12).  Despite this testimony, the Court finds that a genuine dispute of fact exists as to whether the standard of care was breached when the physicians at the Nashville VA failed to *offer* radical cystectomy as a treatment option following the December 2011 CT scan.

> iii. *Allegation that the Nashville VA breached the standard of care by failing to "properly coordinate Mr. McKinley's medical care between and among his many resident and attending physicians" and "by allowing Mr. McKinley to be treated by a different resident physician nearly every visit he had"*

Defendant next challenges Plaintiffs' experts' position that the Nashville VA breached the standard of care by failing to "properly coordinate Mr. McKinley's medical care between and among his many resident and attending physicians"

(Doc. 40-3, p. 10) and "by allowing Mr. McKinley to be treated by a different resident physician nearly every visit he had" (Doc. 39-2, p. 8).

Defendant argues that these opinions are undercut by the experts' admissions that: (1) residents rotate in and out at all teaching hospitals (Doc. 39, p. 140–41, Doc. 40, p. 31); (2) the standard of care did not necessarily require the same attending physician to oversee Mr. McKinley's care during the two years he received treatment at the Nashville VA (Doc. 39, p. 142–43); and (3) there was not a specific instance of poor coordination that resulted in the Nashville VA's failure to address the bladder mass that appeared on the December 2011 CT scan (Doc. 40, pp. 121–22).

The Court disagrees. There is ample evidence to support a claim that the standard of care was breached by the Nashville VA in its failure to properly coordinate Mr. McKinley's care between resident and attending physicians. Dr. White provided extensive testimony in his deposition about the level of coordination required by the standard of care. He explained that communication between the attending and resident physicians should have been better "[s]o that the continuity of care mimics what Mr. McKinley would have gotten had he been in the Vanderbilt University Hospital setting." (Doc. 39, p. 133). Further, he stated that "somebody with this complexity would normally be handled by a chief resident. And [the] chief resident's rotation typically is longer than the other

junior residents. And I think that if you have the same attending starting with the management of this care and you lack the continuity of at least assigning the complexity of this case to a chief resident and that kind of continuity, I think that's a breach of the standard of care." (Doc. 39, p. 141). Further, while Dr. Keaton could not point to a specific instance where communication broke down between the physicians resulting in the Nashville VA's failure to address the bladder mass, he believes it was likely "a reflection of a combination of things" such as "[p]oor coordination in the VA system, difficulties with scheduling in the VA system, changing of physicians." (Doc. 40, p. 122). This testimony creates a genuine dispute of fact as to whether the standard of care was breached by the Nashville VA's lack of coordination of the resident and attending physicians treating Mr. McKinley.

> iv. *Allegation that the Nashville VA breached the standard of care in its treatment of Mr. McKinley following the December 2011 CT scan*

Defendant argues that, based on Plaintiff's experts' testimony, there is no genuine dispute as to whether the standard of care was breached in the Nashville VA's treatment of Mr. McKinley following the December 2011 CT scan. Specifically, Defendant argues that the steps allegedly required by the standard of care, based on Plaintiff's experts' testimony, were the steps taken by the

physicians at the Nashville VA following Mr. McKinley's December 2011 CT scan.

While it may be undisputed that the initial steps taken by the physicians at the Nashville VA following the December 2011 CT scan were appropriate, Plaintiffs experts are clear that, until the physicians knew the cause of the bladder mass in the CT scan, the standard of care required them to continue taking steps to rule out cancer. Both experts insist that the physicians at the Nashville VA failed to do this, and that it was a breach of the standard of care. In his deposition, Dr. White explained the situation as follows:

> The man has a history of bladder cancer. As I've said before, the onus is on us to prove that this mass in the wall of the bladder is not recurrent bladder cancer among the possibilities that the radiologist laid out. And I could not assume that it's one or the other benign possibilities because the recurrent - - if it's recurrent bladder cancer, it is a life threatening condition that needs to be dealt with at the top of the list of things that I need to be sure he doesn't have.

(Doc. 39, p. 115). Ultimately, Dr. White claims that the standard of care required the physicians at the Nashville VA to "find out what's going on in Mr. McKinley's bladder wall." (Doc. 39, p. 119).

Dr. Keaton agreed that the standard of care required the physicians at the Nashville VA to do more than they did to rule out cancer. He stated:

> All right. So we have a CT scan, that if you looked at the scan - - and I don't know that the doctors actually looked at the scan. But you have a CT scan that shows an obvious, pretty significant abnormality in the mass in the bladder. I mean, big enough that it

could be biopsied with a needle by a CT scan. That is typically not the way anybody diagnoses *[sic]* bladder cancer. But you have that CT finding.

And then you have a cystoscopy that thought they saw something. And then they repeat the cystoscopy, and they don't see anything. So you've got some discongruence in the results. So you've got one test that said something, and the other test didn't give you an answer. So you still don't have an answer. So the patient still has a mass in the bladder, and he doesn't have a diagnosis.

So at that point then you would have to go to something alternative. You could try a needle biopsy. You could try another imaging technique to see if maybe the CT scan gave you some kind of false reading . . . . You could have done an MRI . . . . I don't know. I mean, there's different ways you could approach that.

You could have done a PRT scan to see if it lit up on the PRT scan, which would have made you more suspicious for malignancy. But you still have a mass there that's undiagnosed despite the negative cystoscopy.

(Doc. 40, pp. 93–96). Dr. Keaton was adamant that the standard of care was breached by the physicians' failure to do more following the December 2011 CT scan. (Doc. 40, p. 96: 8–10, p. 97: 5–10, pp. 98–99: 23–1, p. 98: 18–21). The Court finds that a genuine dispute of fact exists as to whether the standard of care was breached by the Nashville VA in the course of Mr. McKinley's treatment following the December 2011 CT scan.

>    v.    Allegation that the physicians at the Nashville VA breached the standard of care by not taking additional action to better visualize Mr. McKinley's bladder following his June 2011 cystoscopy

Defendant argues that it is entitled to summary judgment on Plaintiff's claim that the standard of care was breached in not taking additional action to better visualize Mr. McKinley's bladder following the June 2011 cystoscopy, because both of Plaintiff's experts acknowledge that the additional steps that could have been taken were uncommon and potentially impossible.  In support of this, Defendant explains that Dr. White testified that he was not aware whether the Nashville VA had longer instruments that could be used in cystoscopy, which he used in his practice "maybe once a year," and Dr. Keaton testified that perineal cystoscopies are morbid, that he's "never done it," and that he's never had a patient have one done. (Doc. 43-1, p. 15 (citing Doc. 39, p. 98; Doc. 40, p. 71)).  The Court finds that, while it may have been impractical or impossible for the physicians at the Nashville VA to take additional action to better visualize the bladder following the June 2011 cystoscopy, there is evidence sufficient to create a question of fact as to whether the failure to take additional steps constituted a breach of the standard of care.

### 3.    Proving Causation

Defendant next argues that Plaintiff cannot prove that any alleged breach of the applicable standard of care proximately caused Mr. McKinley to suffer

"injuries which would not otherwise have occurred," as required by Tenn. Code Ann. § 29-26-115(a). Specifically, Defendant contends that Plaintiff has failed to support her claims: (1) that Defendant's failure to train, supervise, credential, and monitor resident and attending physicians was a cause in fact of Mr. McKinley's injuries; (2) that Defendant's falsification of medical appointments and wait times was a cause in fact of Mr. McKinley's injuries; and (3) that Mr. McKinley's cancer and ultimate death would not have otherwise occurred absent any alleged negligence by physicians at the Nashville VA.

Tennessee law requires that a plaintiff prove a physician's act or omission *more likely than not* was the cause in fact of the harm. Kilpatrick v. Bryant, 868 S.W.2d 594, 602 (Tenn. 1993) (emphasis added). "This requirement necessarily implies that the plaintiff must have had a better than even chance of surviving or recovering from the underlying condition absent the physician's negligence." Id. Thus, "[a]lthough a plaintiff can recover for harm stemming from the aggravation of an existing illness, the plaintiff may not recover damages for the loss of a less than even chance of obtaining a more favorable medical result." Id. at 602–03.

> i.    *Whether the Nashville VA's failure to train, supervise, credential, and monitor resident and attending physicians more likely than not caused Mr. McKinley's injury*

In her Amended Complaint, Plaintiff alleges that various personnel at the Nashville VA were negligent in failing to properly train, supervise, credential, and

monitor resident and attending physicians. (Doc. 7, p. 19). Defendant moves for judgment in its favor on this claim, arguing (1) that neither Dr. Keaton nor Dr. White have reviewed the credentialing files of the resident and attending physicians, and (2) that neither Dr. Keaton nor Dr. White have offered an opinion regarding negligence by the Nashville VA in the training, supervision, credentialing, or monitoring of its resident and attending physicians. (Doc. 43-1, p. 17). Plaintiff concedes that there is no evidence to support a claim of negligent credentialing. (Doc. 58, p. 20 n. 8). Accordingly, that claim is dismissed.

Defendant is not entitled to summary judgment as to Plaintiff's claim that the Nashville VA failed to train, supervise, and monitor resident and attending physicians. In his expert witness report, Dr. White stated that "[t]he medical providers [of the Nashville VA] . . . failed to properly coordinate Mr. McKinley's care and communicate with one another to ensure that he received the proper medical diagnosis and treatment. The Nashville VA breached the applicable medical standard of care by allowing Mr. McKinley to be treated by a different resident physician nearly every visit he had from July 2010 through May 2012 in the urology department." (Doc. 39-2, p. 8). He reiterated this opinion in his deposition and explained that Mr. McKinley's case was complex and required the continuity of at least assigning the case to a chief resident. (Doc. 39, p. 141).

Similarly, Dr. Keaton stated in his expert report that it is his opinion "that the failure to diagnose Mr. McKinley's bladder cancer and treat it appropriately was the result of a failure at [the Nashville VA] to provide him timely medical care and to properly coordinate Mr. McKinley's medical care between and among his many resident and attending physicians, and such failures caused and contributed to his injuries and ultimately his death." (Doc. 40-3, p. 10). Dr. Keaton blames this breach of the standard of care on "[p]oor coordination in the VA system, difficulties with scheduling in the VA system, changing of physicians." (Doc. 40, p. 122). The Court finds the opinions and testimony of Drs. White and Keaton sufficient to create a genuine dispute of material fact as to whether Defendant's alleged failure to properly train, supervise, and monitor the attending and resident physicians at the Nashville VA caused Mr. McKinley's injuries.

> ii. *Whether the Nashville VA's alleged falsification of medical appointments and wait times more likely than not was the cause in fact of Mr. McKinley's injury*

Defendant argues that Plaintiff's experts have offered no testimony to support the allegation that personnel at the Nashville VA falsified medical appointments and wait times. Plaintiff concedes that this claim is due for summary adjudication. (Doc. 58, p. 20 n. 6). Accordingly, this claim is dismissed.

*iii.* *Whether Mr. McKinley's cancer and ultimate death*
*would otherwise have occurred absent negligence by*
*the physicians at the Nashville VA*

Defendant contends that Plaintiff's experts' testimony fails to establish that

Mr. McKinley's cancer and ultimate death would not otherwise have occurred

absent any alleged breach by the Nashville VA. The Court disagrees. Dr.

Keaton provides the following relevant opinions in his expert report: (1) "had Mr.

McKinley undergone cystectomy (bladder removal) upon the diagnosis of high

grade bladder carcinoma concomitant with urothelial carcinoma in situ that *more*

*likely than not*, he would be alive today"; and (2) "had Mr. McKinley undergone

cystectomy after the results of the December 20, 2011 CT scan which showed

new bladder mass on the outside wall of his bladder consistent with clinical

diagnosis of carcinoma, then *more likely than not*, he would be alive today."

(Doc. 40-3, p. 10) (emphasis added). Although Dr. Keaton concedes at one point

that he would not have recommended radical cystectomy as a treatment option,

he believes the option should have been discussed with Mr. McKinley and that

Mr. McKinley would have been a candidate for cystectomy. (Doc. 40, pp. 58,

62). He goes on to say that "cure rates with cystectomy with [the kind of cancer

Mr. McKinley had] are around 60 to 70 percent." (Doc. 40, p. 114). The Court

finds this testimony sufficient to create a question of fact as to whether the

Nashville VA's alleged negligence more likely than not caused Mr. McKinley's cancer and ultimate death.

### C.    Negligence Claims That Predate December 20, 2011

Defendant argues that it is entitled to dismissal of all negligence claims based on conduct that occurred prior to December 20, 2011, because Plaintiff failed to present these claims within two years of the alleged negligence and because Plaintiff failed to exhaust her administrative remedies with respect to these claims.

In order to pursue a claim under the FTCA, an individual must file an administrative claim with the appropriate federal agency within two years of the claim accruing and receive a final denial of the claim before filing a suit in federal court.  See 28 U.S.C. § 2675(a).  A claim is deemed presented to the federal government, "when a federal agency receives . . . an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the accident."  Barnett v. Okeechobee Hosp., 283 F.3d 1232, 1237 (11th Cir. 2002) (citing 28 C.F.R. § 14.2 (2001)).  A claimant may amend his or her administrative claim at any time prior to final agency action or prior to exercising his or her option to file suit.  28 C.F.R. § 14.2(c).  If a plaintiff fails to meet this requirement, the court has no

subject matter jurisdiction over plaintiff's claim.  See <u>Dalrymple v. United States</u>, 460 F.3d 1318, 1324 (11th Cir. 2006) (citing 28 U.S.C. §§ 2675, 2401(b); 28 C.F.R. § 14.2(a)).

A claimant's notice is sufficient if it gives the administrative agency "enough information to allow the agency to begin its own investigation of the alleged events and explore the possibility of settlement." <u>Burchfield v. United States</u>, 168 F.3d 1252, 1255 (11th Cir. 1999) (internal quotation marks and citation omitted).  "We do not require the claimant to provide the agency with a preview of his or her lawsuit by reciting every possible theory of recovery, or every factual detail that might be relevant." <u>Id.</u> (internal citations omitted).  "In short, the amount of information required is minimal." <u>Id.</u> (internal quotation marks and citation omitted).

On October 4, 2013, Plaintiff's attorney provided notice to the United States of Plaintiff's claims against the Nashville VA on behalf of her husband, Howard McKinley.  (Doc. 37-2).  Plaintiff's Form 95 alleged negligence and various breaches of the applicable standard of care, based on the failure of physicians at the Nashville VA to determine if the mass appearing in Mr. McKinley's December 20, 2011 CT scan was a recurrence of bladder cancer. (Doc. 37-2, p. 3).  On September 8, 2014, Plaintiff submitted an amended Form 95, adding allegations that the Nashville VA failed to properly train, supervise,

and credential resident physicians during Mr. McKinley's treatment and that excessive wait times caused a delay in Mr. McKinley's treatment. (Doc. 49-3). Following the denial of her administrative claim, Plaintiff filed her Complaint in this Court on March 20, 2015. (Doc. 1). According to Defendant, Plaintiff first introduced theories of negligence predating December 20, 2011 in March of 2016 in Dr. White's expert witness report.

### 1. Exhaustion of Administrative Remedies

Defendant argues that, because Plaintiff's negligence claims predating December 20, 2011 were first presented in Dr. White's expert witness report in March of 2016, Plaintiff has failed to exhaust her administrative remedies with respect to these allegations. The Court disagrees and finds that Plaintiff's original Form 95, submitted October 4, 2013, was sufficient to provide notice to Defendant of all potential claims arising out of Mr. McKinley's treatment for bladder cancer at the Nashville VA. Contrary to Defendant's position, Plaintiff need not have alleged specific negligent acts predating December 20, 2011 in the Form 95 in order to be able to recover for these negligent acts in this lawsuit. "An administrative agency is deemed to be on notice not only of the theories of recovery stated in the claim, but of the theories of recovery that its reasonable investigation of the specific allegations of the claim should reveal." Id. Here, the original Form 95 was accompanied by the Affidavit of Dr. Marianne Barnhill.

(Doc. 37-2, pp. 7–17).  The Affidavit provided a summary of Mr. McKinley's care at the Nashville VA, dating back to 2010.  The Court finds that the original Form 95 provided notice of all potential claims arising out of Mr. McKinley's treatment for bladder cancer at the Nashville VA, beginning in July of 2010.

        2.    Timeliness

Defendant further contends that Plaintiff's claims of negligence based on conduct that occurred prior to December 20, 2011 were not presented "in writing to the appropriate Federal agency within two years after such claim accrue[d]." 28 U.S.C. § 2401(b).  Accordingly, Defendant's position is that these claims are untimely under the FTCA and should be barred.  The Court disagrees.

"[A] medical malpractice claim under the FTCA accrues when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both [his] injury and its connection with some act of the defendant."  Price v. United States, 775 F.2d 1491, 1494 (11th Cir. 1985).  The Court finds that Mr. McKinley's claim accrued not earlier than October 2, 2012, when Mr. McKinley underwent tumor removal surgery and a large necrotic tumor was removed, confirming that he had malignant bladder cancer.  Plaintiff's administrative claim was filed on October 4, 2013.

Because Plaintiff timely filed her administrative claim, and because her claim was sufficient to put Defendant on notice of all claims arising out of Mr.

McKinley's treatment for bladder cancer at the Nashville VA, Defendant is not entitled to summary judgment on Plaintiff's allegations of negligent conduct occurring prior to December 20, 2011.

## IV.    CONCLUSION

In light of the foregoing, the Court sets this case for trial and orders the following:

1.  Plaintiff's Partial Motion to Exclude Expert Testimony of Glenn Preminger, M.D. (Doc. 36) is **GRANTED**.

2.  Defendant's Motion to Exclude the Expert Witness Testimony of Drs. Mark Keaton and Maxwell White (Doc. 37) is **DENIED**.

3.  Defendant's Motion for Summary Judgment (Doc. 43) is **GRANTED IN PART** and **DENIED IN PART**.   The following claims are dismissed: Plaintiff's claim that the Nashville VA negligently credentialed resident and attending physicians and Plaintiff's claim that personnel at the Nashville VA falsified medical appointments and wait times.  All other claims may proceed.

**SO ORDERED**, this the 10th day of August, 2017.


_s/ Hugh Lawson_____
**HUGH LAWSON, SENIOR JUDGE**


les